UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SCOTT SANDERS,

                              Movant,


              –against–                                    15-cv-2808 (LAK)
                                                      (S1 12-cr-0574 (LAK))

UNITED STATES OF AMERICA.

                              Respondent
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**
(Corrected)



              Appearances:

                              Randall W. Jackson
                              BOIES, SCHILLER & FLEXNER LLC
                              *Attorney for Movant*


                              Paul M. Krieger
                              Matthew D. Podolsky
                              Assistant United States Attorneys
                              PREET BHARARA
                              UNITED STATES ATTORNEY
                              *Attorneys for Respondent*


LEWIS A. KAPLAN, *District Judge.*

              This Section 2255 motion presents claims of ineffective assistance of counsel that

reflect vastly more nerve on the part of the movant than merit.[1]  Movant Scott Sanders was found guilty at trial of an egregious, multimillion dollar insurance fraud, his second conviction for substantially similar schemes and his fourth felony conviction.  He then fired his trial counsel, Jeffrey Hoffman, and hired new counsel, Paul Shechtman, for, among other things, sentencing.  In advance of sentencing, and on Shechtman's advice, he entered into a Sentencing Agreement (the "SA") with the government pursuant to which:

- The government stipulated to a much reduced loss amount and sentencing guideline range and agreed also not to appeal from any sentence within or above that range.

- Sanders agreed (1) that he would not file a direct appeal nor bring any collateral attack, including any collateral attack based on ineffective assistance of counsel ("IAC"), as long as he was sentenced within the stipulated guideline range, and (2) to pay restitution in the amount of $5.4 million, lower than the figure that otherwise might have been required.

At sentencing, Sanders assured the Court, under oath, that he had read the SA, consulted fully with his sentencing counsel about the SA and entered into it knowingly and voluntarily.  He stated that he was "absolutely" satisfied with the representation provided to him by Shechtman, a distinguished attorney.  Moreover, Sanders contended that his entry into the SA warranted a sentence below the Guideline range to which Sanders had stipulated because it reflected Sanders' remorse and acceptance of responsibility for his fraudulent actions.

---

[1]  The Court suggests no criticism of movant's counsel, who represented his client ably and properly in all respects.

The Court imposed a below-guidelines sentence and made clear that it had done so because it accepted Sanders' claims of remorse and acceptance of responsibility. Indeed, it specifically noted that it would not have imposed the same sentence but for Sanders' waiver of any IAC claims. Thus, Sanders got exactly what he bargained for, a reduced sentence – indeed, a sentence below the guideline range to which he had stipulated in the SA – in exchange for his waiver.

Now, having obtained the benefit of the SA and its waiver, Sanders – in flat contravention of the SA that he knowingly and voluntarily signed and relied upon as evidence of his claimed remorse – has turned around and mounted this double-barreled IAC challenge:

The first barrel reflects the fact that any attack on the effectiveness of his trial counsel, Mr. Hoffman, is barred by Sanders' waiver unless he somehow can avoid the provisions of the SA that favor the government (while retaining the benefits the SA brought Sanders). So he contends that Shechtman's advice to enter into the SA constituted IAC because, among other things, Shechtman did not explore adequately the merits of Sanders' potential IAC claim with respect to Hoffman's performance.

Second, he contends that Hoffman's performance was constitutionally deficient, principally because Hoffman allegedly did not advise Sanders of his maximum sentence exposure if Sanders were convicted after trial. In consequence, Sanders says, he turned down a plea offer that would have carried a 33 to 41 month Guideline range and a maximum exposure of 60 months imprisonment.

This Court – with the benefit of an evidentiary hearing and extensive briefing by experienced retained counsel – rejects Sanders' claims in their entirety.

As an initial matter, Sanders' suggestion that Shechtman's representation was so deficient "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"[2] – the standard established by *Strickland* – is risible. And while the Court's function in determining an IAC claim is not to "grade counsel's performance,"[3] it bears mention that Shechtman's representation of Sanders, and especially his advice with respect to the SA, was skilled, creative, and (Sanders' dissatisfaction with the result notwithstanding) effective. Accordingly, Sanders' waiver of his right to challenge his conviction and/or sentence is entirely enforceable, as he has not satisfied the first prong of the *Strickland* standard that defines the substance of a meritorious IAC claim.

This conclusion makes it unnecessary to consider either the prejudice prong of the *Strickland* standard as it applies to Shechtman's representation of Sanders or the IAC claim with respect to Hoffman's representation. Nevertheless, the Court now has a full record. And it has concluded that there is no merit to any of Sanders' claims with respect to either Shechtman or Hoffman. Thus, the motion would be denied even if the Court accepted Sanders' IAC argument concerning the first *Strickland* prong with respect to Shechtman.

*Facts*

It is unnecessary to develop many of the operative facts underlying Sanders' business activities for which he ultimately was convicted at trial. It suffices to say only the following:

---

[2]

*Strickland v. Washington,* 466 U.S. 668, 687 (1984).

[3]

*Id.* at 696.

At some point during or before 2009, the United States Postal Service, and perhaps other government agencies, opened an investigation into possible mail and insurance fraud, identity theft, and other crimes committed by Sanders in the course of running his livery cab business.  In a largely successful effort to avoid millions of dollars in insurance premiums on his company's vehicles, Sanders lied on insurance applications.  He stated falsely, *inter alia*, that the vehicles were garaged in small towns upstate and used for low risk purposes rather than garaged and used as taxis in New York City.  The insurers thus charged far lower insurance premiums than they would have had Sanders told the truth. In addition, Sanders used various aliases or used the names of his drivers and forged their signatures on insurance applications to conceal his personal involvement.[4]

*The Investigation and Pre-Indictment Plea Discussions*

In September 2011, long before any charges were filed, Sanders and his attorneys, Hoffman and Susan Wolfe, met with investigators from the U.S. Postal Inspection Service, who previewed some of their evidence against Sanders.  The investigators gave Sanders an extensive spreadsheet detailing the government's then-current information and its estimate of the total losses for which Sanders was responsible, which amounted to over $29 million.[5]

Wolfe testified that "the [sentencing] guidelines . . . were a frequent topic of conversation" following this meeting, and she specifically warned Sanders that the government's

---

[4]

§ 2255 hearing transcript ("Tr.") at 212:16–213:1; 220:1–15.

[5]

Sanders Decl. ¶ 11(e), DI 143-1; Tr. 216:16–22; Tr. 218:2–16; Tr. 239:14–22; GX 301.

loss estimate would result in "an astronomical jump in the guidelines."[6]  At a later point, when the

government had reduced its view of the estimated loss amount to $7 to $20 million, Wolfe recalled

the government explaining to Sanders its view that this amount "would result in a sentence of at

least 10 years."[7]

       In January 2012, Wolfe met with Sanders to discuss whether to seek a pre-indictment

resolution of the case.[8]   The danger of waiting, she told Sanders, was that the government likely

would continue its investigation into Sanders' business and thus might uncover additional

incriminating evidence against Sanders.  This in turn could lead to more charges being filed than

Hoffman and Wolfe anticipated at that time.[9]  Her notes of that meeting say that "I told him he could

get more . . . time after trial"[10] because, as a "general proposition . . . one typically gets more time

after trial than if one takes a plea and certainly more time than if there's no indictment."[11]

       Two events allegedly occurred in March 2012 that are central to Sanders' claim that

Hoffman's representation was deficient and about which the evidence at the evidentiary hearing

conflicted in significant respects.

---

[6]     Tr. 241:1–18.

[7]     Tr. 242:24–243:3.

[8]     Tr. 238:8–18.

[9]     Tr. 238:17–23.

[10]    GX 300.

[11]    Tr. 239:1–4.  The Court finds that she so advised him.

*The Alleged March 2012 Plea Offer*

First, on March 8, Sanders and Hoffman had a proffer session with then-Assistant United States Attorney Lee Renzin.[12]   The purpose was both for the government to preview its evidence against Sanders and for Sanders to offer any innocent explanation he might have.[13] Sanders claims that Renzin telephoned Hoffman's office later that day while Sanders was present with Hoffman.[14]   According to Sanders, Renzin then offered a plea deal with a guidelines range of 41 to 51 months.[15]   However, no other witness corroborated even the occurrence of such a conversation, let alone its alleged content.[16]   The Court is not persuaded that any such call took place or, for that matter, that the government gave any indication, formal or informal, at or about that time, that it would consider a plea deal with such a low guideline range.   The 41 to 51 month offer in March 2012 is a prevarication by Sanders and no more.

*The March 13, 2012 Meeting*

The second event that month relied upon by Sanders – and the one that did occur – took place on March 13.   As part of his criminal scheme, Sanders had used his wife Marcie Sanders'

---

[12]   Tr. 41:9–23.

[13]   Tr. 55:8–57:7.

[14]   Tr. 162:10–24.

[15]   Tr. 162:10–24.

[16]   *See* Tr. 51:19-25 (Hoffman denying recollection of call).   Wolfe did not testify on this point one way or the other.

insurance license to write some of the fraudulent policies.  She therefore was concerned that she too might have criminal exposure and retained her own counsel, Andrew Lankler.  On March 13, Sanders, his wife, and Hoffman all met with Lankler to introduce him to the case.[17]  While the three witnesses who testified about the meeting agreed on its basic purpose, their accounts of some important details differ in significant respects.

In Sanders' telling, Hoffman advised him at this meeting to reject Renzin's alleged 41 to 51 month plea offer because, according to Sanders, Hoffman said that Sanders would get a better result after trial.[18]  Lankler confirmed that such a gathering took place, but only to the extent that he testified that Hoffman told Sanders that Sanders would get a better result after trial.[19]  But better than what?  Lankler did not recall what if anything was said with respect to any offer or indication by the government about what sort of guideline range it might accept as part of a plea deal.[20]  In fact, Sanders admitted that Hoffman did not describe to Lankler the terms of any government offer during the meeting.[21]

That leaves Hoffman's testimony.  Hoffman testified that he never told Sanders that Sanders would do better after trial.[22]  And, contrary to Sanders' assertion that the government had

---

17

      Tr. 67, 69-70.

18

      Sanders Decl. ¶ 11(f); Tr. 165:22–166:7.

19

      Tr. 69:9–25.

20

      Tr. 70:5–7.

21

      Tr. 177:9–178:12.

22

      Tr. 18:1–8, 33:16–18.

proposed a plea with a stipulated 41 to 51 month guideline range, Hoffman testified that no specific plea offer was on the table at this time. Discussions had been going on between Hoffman and the government for years, and "the kinds of things that were being offered were in the eight to ten-year range."[23] But these conversations had been "very amorphous," and there was no specific deal on the table at this time.[24] Indeed, the government at the start of the trial represented to the Court that "the plea offers that were made to the defendant were an offer made in an October 8, 2012 letter" that had expired and the renewal of that offer on January 15, 2013.[25] Neither Sanders nor his trial counsel, Hoffman, both of whom were present, disputed that representation or suggested that any other offers had been made. Thus, the only significant evidence of any offer, as distinguished from amorphous possibilities, as of March 2012, let alone an offer with a 41 to 51 month stipulated guideline range, is Sanders' testimony, and Sanders was not a credible witness.[26]

---

[23]      Tr. 31:19–21.

[24]      Tr. 31:12–33:5.

[25]      Trial Tr., Mar. 6, 2013, at 2:5-18.

This has been its practice in this district since *Lafler v. Cooper,* 132 S. Ct. 1376 (2012), and *Missouri v. Frye,* 132 S. Ct. 1399 (2012).

[26]      Marcie Sanders submitted a declaration that touched on this meeting [12-cr-0574 (LAK), DI 139-3], but was not called as a witness. The declaration said that Hoffman discussed what she described as "the government's plea offer," said that the prison time the government sought was "excessive," and recommended that Sanders reject it because he would end up with less time even if convicted." *Id.* ¶ 3. But the declaration did not describe the alleged plea offer or the amount of prison time the government allegedly sought.

Mrs. Sanders' account is consistent with Hoffman's recollection that there had been "amorphous" discussions in which the government had talked about eight to ten years of imprisonment save for her use of the term "plea offer." The mistaken use, especially by a lay person like Mrs. Sanders, of the term "plea offer" to refer to the sort of discussions that

In sum on this particular point, the Court finds that the government made no plea offer during this time period, let alone an offer that included a stipulated guideline range of 41 to 51 months.  That is not to say, however, that there were no discussions between Hoffman and the government with respect to a possible pre-indictment disposition.  To the contrary.  The Court finds that the government's position in this time period was that it would or might be prepared to accept a plea that entailed a stipulated guideline range in the neighborhood of eight to ten years.  The Court finds also that Hoffman advised Sanders not to pursue that possibility because he thought Sanders probably would receive a lower sentence even if convicted at trial.  And what Lankler heard was the latter part of that discussion, i.e., Hoffman's advice but not the reference to a possible sentence of eight to ten years.  And there is no evidence, even from Sanders himself, that he would have accepted a plea with a guideline range of eight to ten years.

Lankler was troubled by Hoffman's statement at the March 13 meeting that Sanders would do better after trial than whatever the government then was suggesting.  That unease was perfectly understandable, as it is common knowledge at the criminal Bar that defendants convicted at trial often are sentenced more severely than those who are situated similarly but who have pleaded guilty.[27]  Indeed, the Sentencing Guidelines recognize this fact of life by providing for downward

---

Hoffman spoke of, would be entirely understandable.  Especially in light of the failure to call Mrs. Sanders as a witness, the Court declines to attach any significance to her characterization of the subject of discussion at that meeting.

[27]    Tr. 70:2–71:1 (Lankler testifying that it would be "very unusual for defendants to receive better sentences after being convicted as opposed to pleading").

adjustment of offense levels for those who have accepted responsibility by entering guilty pleas.[28] So he advised Marcie Sanders to have her husband consult another attorney for a second opinion and suggested Paul Shechtman.[29]  But neither Sanders nor his wife followed that advice.[30]

*The Indictment is Unsealed and the Written Plea Offer*

The indictment, which  was filed on July 31, 2012 and unsealed on August 10, 2012, charged Sanders with one count of conspiracy to commit mail and wire fraud, five substantive counts of mail fraud, and one count of aggravated identity theft.[31]

On October 8, 2012, the government made a written plea offer under which Sanders, had he accepted it, would have pled to one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, with a guideline range of 33 to 41 months and a statutory maximum of five years imprisonment.[32]  Hoffman explained to Sanders why that was an "excellent plea deal" Hoffman thought Sanders should accept.[33]   The key, Hoffman explained, was the conspiracy offense's

---

[28]     U.S.S.G. § 3E1.1(a); *id.* application note 3 ("Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction . . . will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a)").

[29]     Tr. 69:3–71:14.

[30]     Tr. 73:15–20.

[31]     DI 2; Order to Unseal Indictment, DI 3.

[32]     GX 102.

[33]     Tr. 13:19–14:5.

maximum sentence of five years, whereas the substantive wire fraud charges were likely to yield

a sentence of eight to ten years but could be even higher because the Court would be constrained

only the statutory maximum and might depart upwards given Sanders' criminal history.[34]

Sanders nonetheless rejected the offer.

Wolfe was so surprised by Sanders' rejection of this offer that she called him.  She

explained that she

"wanted to make sure and hear for myself that he was not interested in this plea
offer.  What I remember specifically is that I said to Scott, 'If I could get this down
to 18 months, would you take it?'  And he said, 'No,' in a way that pretty much
precluded further discussions.  He said something to the effect, you know, 'I'd just
as well do the 5 years as 10 years.'"[35]

Wolfe reminded Sanders that his sentence in fact could exceed ten years.  Nevertheless, by the end

of the call, Sanders' said that he would not consider any plea that carried a sentence in excess of a

year and a day.[36]  When the government renewed this offer some months later, Hoffman again

brought it to Sanders, and Sanders again rejected it.[37]

Here it bears discussing the factual crux of Sanders' IAC claim against Hoffman –

namely, that but for Hoffman's ineffective representation in failing adequately to inform Sanders

of his maximum exposure and the strength of the government's case, Sanders would have accepted

a plea deal that would have yielded a more favorable outcome than the sentence he received after

---

[34]
      Tr. 59:7–11.

[35]
      Tr. 247:11–19.

[36]
      Tr. 247:24–248:7.

[37]
      Tr. 45:12–46:19.

being convicted at trial. The only evidence before the Court in support of this contention is the word of Scott Sanders himself – that (1) he was not advised of his maximum exposure, and (2) had he been, he would have taken a plea. But as the Court discussed on the record at the end of the evidentiary hearing, Sanders' behavior and demeanor on the witness stand strongly suggested that his testimony was false.[38] And there are several compelling pieces of evidence on the other side of the ledger.

First, there is significant evidence that Sanders was advised on the possible sentencing consequences at several points. As early as January 2012, Wolfe told Sanders that the government's $29 million loss figure could yield a sentence of ten years or more. Hoffman told him around March 2012 that the government was talking about a possible sentence in the eight-to-ten-year range. And in discussing the merits of the October 2012 offer, which contained the five-year cap, Hoffman and Wolfe each separately advised Sanders that he would be facing eight to ten years or more if Sanders were convicted at trial. Yet Sanders rejected even the October 2012 offer.

Second, this was not Sanders' first experience with the justice system nor with the federal Sentencing Guidelines. In 1996, Sanders pled guilty before Judge Brieant to one count of racketeering based on activity that was substantially similar to that for which he ultimately was convicted in this case. During his allocution, Sanders was asked specifically whether he had

---

[38]    Tr. 340–342. The Court found, *inter alia*, that "Mr. Sanders [was] a witness remarkably lacking in credibility. I think he repeatedly told untruths to me during this hearing. He was, on more than one occasion, testifying to assertions that were flatly inconsistent with documents and transcripts and were obviously false. He was evasive. He was not candid. And the various indicia to which triers of fact traditionally look in evaluating credibility, demeanor factors, responsiveness factors repeatedly suggested to me that he was lying, and he full well understood he was lying." Tr. 342:10–20.

discussed the statutory maximum penalties and the effect of the Sentencing Guidelines on his plea.[39] Given Sanders' demeanor during his testimony, his previous experience with the Sentencing Guidelines, the testimony of Hoffman and Wolfe, and the fact that Hoffman and Wolfe both are experienced criminal defense attorneys, Sanders' claim that they never advised him as to his sentencing exposure simply is not credible.

Next, there is the fact that both Hoffman and Wolfe testified credibly that Sanders was unwilling to take any deal that would have exposed him to more than a year and a day imprisonment, or perhaps 18 months at the outside.[40] Hoffman testified that following the October 2012 plea offer, Sanders told him first that he might consider an offer of 18 months, but when Hoffman pressed him about whether he would accept that offer, said he would only take a year and a day.[41] Hoffman was left with the impression that Sanders "wasn't really serious, but he was pushing to see . . . where it could go. Because if I said, 'Okay, I'll go for a year and a day,' my thinking was, knowing Scott, he'd say, 'I want six months.'"[42] Similarly, as discussed above,

---

[39]
    CX B, at 13:24–14:3.

[40]
    The Court does not take the fact that Hoffman engaged in plea discussions with the government as evidence of Sanders' desire to resolve this matter with a plea. Hoffman testified credibly that he believed that he was duty-bound to negotiate a potential plea agreement despite the fact that Sanders never gave any indication that he would accept a plea or even wanted Hoffman to attempt such negotiations. In his experience, even clients who consistently express a desire to go to trial may change their minds as more evidence comes to light, and if Hoffman previously has not engaged in plea negotiations he will not have "gotten the best possible plea offer I can, and so I'm doing them a disservice." Tr. 57:12–58:5.

[41]
    Tr. 13:19–14:14.

[42]
    Tr. 14:15–18.

Sanders told Wolfe that he would be unwilling to consider any plea that exceeded a year and a day.

And, as Shechtman pointed out in his testimony, the fact that Sanders did not seek a second opinion

after the March 2012 meeting, even given Lankler's concerns, tended to confirm that Sanders was

not serious about taking any plea.[43]

The testimony of Hoffman and Wolfe that Sanders' was unwilling to take a plea deal

is corroborated by the evidence that he firmly believed he should be able to resolve the matter

through a civil penalty despite the fact that he knew full well he was submitting fraudulent insurance

applications.  As Hoffman testified, "[Sanders] had always said this was a civil matter, just like all

the other matters that had come up with basically the same allegations that my firm had handled, and

that was not a crime."[44]  In essence, Sanders asserted that the insurance companies were aware or

willfully ignorant of the false information he put on his applications and acquiesced because they

wanted his business, so he felt it unfair that he was facing any prison time.  Lankler testified that,

during the March 13 meeting, Sanders appeared "confident" and even "arrogant" in his assertion that

the government misunderstood the case.[45]  Even after Sanders was convicted and awaiting

sentencing, he wrote Shechtman that:

> "The brokers and underwriters knew that our risks were located in NYC, but kept a
> blind eye because they wanted and NEEDED the business.  The insurance carriers
> would have to be complete idiots that Amenia [the town listed on some of Sanders'
> false insurance applications] with a population of 3000 people was able to keep 200
> vehicles busy and moving all the time.  The insurance carriers enjoyed the money,
> the underwriters fulfilled their quotas, the brokers received a lot of commissions, and

---

[43]   Tr. 116:16–19.

[44]   Tr. 48:17–21.

[45]   Tr. 81:8–24.

> I was able to build my business.  Everyone made money and now they want to send me to jail for 12 years.  This is really unfair!!!"[46]

In sum, the evidence that Sanders was not advised about his possible sentencing exposure and that he would have taken a plea but for this failure is far outweighed by the evidence and indicators to the contrary.  The Court therefore finds that Sanders was advised both about his sentencing exposure and the merits of the plea offers and possibilities.  The Court finds further that Sanders rejected them all, with full information, and that he never seriously considered accepting any plea that could result in a sentence in excess of a year and a day.  The assertion that he would have accepted any plea offer actually extended to him is false.

*Post-Trial Proceedings*

Sanders was convicted on all counts[47] following jury deliberation of two hours or less.  In April 2013, following the denial of Sanders' post-verdict motions, Sanders retained Paul Shechtman to review potential options for appeal.[48]

---

[46]

GX 504.

[47]

Sanders was tried on a superseding indictment (S1) that was returned after the rejection of the plea offer.  While there were minor differences, both the original and the superseding indictment in substance charged the same seven offenses.   *Compare* DI 2, *with* DI 18.  There has been no suggestion that any difference between the two is material to this motion.

[48]

Tr. 111:15–18.

Mr. Shechtman is no journeyman defense lawyer.  He served in the U.S. Attorney's office for this district, including as chief of the criminal division, was director of criminal justice for the State of New York, and teaches criminal procedure at Columbia Law School.[49]  As one would expect, his review of Sanders' case included both substantial legal analysis as well as interviews with trial counsel and other relevant witnesses.  Shechtman and Hoffman met on at least two occasions, on one of these joined by Wolfe.[50]  Hoffman told Shechtman that he had worked hard to get a favorable plea offer and believed he had done so.[51]  Hoffman said also that, although he had explained that Sanders' sentence could be eight years if convicted at trial, Sanders maintained that "this is a civil case and unless they're offering me a year and a day, I'm not taking it."[52]  Shechtman was aware of Sanders' allegation that Hoffman told him in March 2012 that he would get a better

---

[49]

       Tr. 100:18–101:21.

[50]

       Tr. 139:10-12.

[51]

       Tr. 109:22–110:11.

[52]

       Tr. 110:4–6.  Hoffman relayed also that Sanders at another point had expressed a potential willingness to accept an 18-month plea.  As previously noted, however, Hoffman did not believe that this was genuine.  Tr. 110:7–22.

18

result after trial and that Lankler would corroborate this story.[53]  But when Shechtman questioned Hoffman on this point, Hoffman denied ever making any such statement.[54]

Shechtman spoke also with Lankler.  Despite the fact that Lankler had serious concerns about Hoffman's representation of Sanders prior to and during trial, Lankler told Shechtman he believed an IAC claim against Hoffman, "in light of what Hoffman was likely to say concerning Scott's position on a plea[,] . . . [would be] an uphill climb . . . such that it had greater value as a bargaining chip than it did as a standalone actual motion."[55]  Lankler testified also that he believed Sanders to be well-informed about and experienced in the criminal justice system, "fully aware of the defenses that were going to be imposed in the case," and that Sanders' "position regarding the government not understanding" his case was born out of his review of the government's evidence.[56]

---

[53]

There is one discrepancy in Shechtman's testimony on this point that bears mention.  He testified that Lankler told him of a meeting in the first quarter of 2012 at which Hoffman advised Sanders to reject a plea offer with a guideline range of 33 to 41 months and a five-year cap.  Tr. 108:9–22.  This had to have been a reference to the March 2012 meeting when Lankler was first brought into the case.  The Court finds that this is Shechtman's good faith recollection of what he was told.  However, because (1) Lankler testified that he did not know what guideline range was under discussion in March 2012, (2) Hoffman testified that discussions with the government at that point were "amorphous" and in the 8-to-10-year range, (3) Sanders confirmed that Lankler was not informed of the details of the plea offer, and (4) the details Shechtman recalled mirror those of the October 2012 offer, the Court concludes that Shechtman in good faith conflated the details of the March 2012 meeting with the details of the later plea offer.

[54]

Tr. 112:10–20.

[55]

Tr. 83:17–24.

[56]

Tr. 84:4–9.

Upon review of the evidence that likely would be offered at an IAC hearing, Shechtman believed it would be a difficult claim to win.  He certainly did not take a rose-colored view of Hoffman's representation, telling the Court at the sentencing hearing that he thought Hoffman's representation had been "shameful," particularly in regards to Hoffman's failure to "press[] [Sanders] vigorously" to plead guilty.[57]   However, an IAC claim would rest largely on testimony from Sanders and Lankler.  Shechtman had serious doubts about whether Sanders would be a credible witness because "sometimes Scott and the truth parted and I wasn't sure I wanted him on the witness stand."[58]  He thought also that the likely testimony from Lankler "had its weaknesses" for two reasons.  First, the March 2012 meeting at which Lankler was present had been long before the indictment, any written plea offer, and trial.  Second, Shechtman thought it a "bad fact" that Sanders did not take Lanker's advice after that meeting to consult with another attorney.[59]   In Shechtman's analysis, that "tended to confirm Mr. Hoffman's view that unless it was a year and a day . . . Mr. Sanders didn't want it.  Hence, he wasn't looking for additional advice."[60]

Sanders' and Lanker's testimony would have been weighed against the testimony of Hoffman and Wolfe.  Shechtman knew they would testify that they had advised Sanders of the guidelines and possible sentencing range if convicted at trial and had informed Sanders of the plea offers and explained their merits.  Moreover, they were likely to testify that Sanders had been

---

[57]  Tr. of Sentencing Proceedings ("Sentencing Tr."), February 14, 2014, DI 121, at 4.

[58]  Tr. 138:15–17.

[59]  Tr. 116:5–22.

[60]  Tr. 116:16–19.

unwilling to take any plea deal in excess of a year and a day.  Shechtman concluded that an IAC claim would turn in large part on a "credibility contest" between Sanders and Hoffman, and he thought that contest unlikely to go in Sanders' favor.[61]  In addition, even if Sanders could prove that Hoffman's representation had been ineffective, Shechtman thought, Sanders would be unlikely to succeed in proving prejudice in view of Hoffman's and Wolfe's testimony that Sanders was unwilling seriously to entertain a plea offer under any circumstances, which he thought "was probably true."[62]

At bottom, Shechtman believed that the "habeas claim was nonfrivolous" but was unlikely to succeed.  He therefore sought to use the potential claim to Sanders' advantage as a bargaining chip.  Shechtman previously had used a similar tactic successfully before the undersigned in *United States v. Ballesteros*.[63]  There, Shechtman represented a defendant who, in Shechtman's estimation, had viable appellate issues.  However, in return for waiving his appellate rights, the government agreed to a very low loss calculation and excluded relevant conduct, thus lowering the guidelines calculation and yielding what Shechtman believed to be a favorable sentence.[64]

In Sanders' case, Shechtman thought waiving the claim could be used as a valuable bargaining chip in negotiations with the government.  And indeed, in exchange for Sanders' waiver

---

[61]

Tr. 117:24–118:1.

[62]

Tr. 117:22–118:5.  Sanders confirmed that Shechtman advised him not that the ineffective assistance of counsel claim was not viable, but that, in Shechtman's opinion, it was not the best course of action for Sanders to take because the conflicting testimony between Sanders and Hoffman would be a significant hurdle.  Tr. 173:25–174:9, 174:19–22.

[63]

01-cr-258.

[64]

Tr. 136:15–25.

of his rights to appellate review and collateral attack, the government agreed not to pursue a guideline enhancement for abuse of trust and significantly lowered the loss calculation from approximately $16 million to $5.5 million.[65]

In addition, Shechtman believed that the Court would view this waiver as a demonstration of Sanders' remorse and acceptance of responsibility, as it had in *Ballesteros*. In his view, Shechtman believed the Court "thought Scott Sanders was remorseless and thought that the criminal justice system was somehow a joke," which was "a very bad position to be in at sentencing in this case," and he was hopeful that the SA could improve Sanders' standing with the Court.[66]

*Sentencing and Related Events*

Sanders, acting on Shechtman's advice, entered into the SA, in which the parties stipulated to a guideline range of 145 to 175 months' imprisonment and Sanders (1) preserved his ability to argue for a below-guidelines sentence, and (2) waived any right to appeal from or collaterally attack any judgment imposing any sentence within or below the stipulated guideline range.[67] Most importantly, the waiver expressly covered any claim of IAC "during any stage of the criminal proceedings in this matter (such as during plea discussions, at trial, or in connection with sentencing)."[68]

---

[65]

Tr. 118:21–119:12.

[66]

Tr. 119:17–23.

[67]

DI 143-11.

[68]

DI 143-11.

Sanders appeared for sentencing on February 14, 2014.[69]   The Court carefully allocuted Sanders on the waiver of his appellate and collateral attack rights.[70]   Under oath, Sanders testified that he had read the plea agreement, discussed it fully with Shechtman, and was "absolutely" satisfied in all respects with Shechtman's representation.[71]   He answered in the affirmative when the Court asked whether he understood that SA barred him from "fil[ing] a direct appeal or otherwise challeng[ing] any sentence imposed in this case or the conviction for any reason including but not limited to any effective assistance of counsel at any stage in the proceedings."[72] He testified that he freely and voluntarily waived any and all rights to attack his conviction after having consulted fully with Shechtman.[73]

Both Shechtman and Sanders relied upon the SA and Sanders' waiver of any right to appeal or to attack his conviction collaterally as demonstrating his remorse and acceptance of responsibility, and both argued on that basis for leniency.   Sanders said that he had interviewed

---

[69]

Minute Entry dated Feb. 14, 2014.

[70]

Sentencing Tr. at 9 (Shechtman stating that "[t]he plea agreement we entered with the government waives his right to file a 2255, including one for ineffective assistance of counsel.  I have discussed this at length with Mr. Sanders.").

[71]

Sentencing Tr. at 10-11.

[72]

Sentencing Tr. at 11.

[73]

Sentencing Tr. at 12.  Sanders claimed at the hearing on this motion that he did not read or understand the SA.  Tr. 185:5–10, 198:18–21.  The Court finds that testimony was false.

several lawyers following his conviction at trial, "was lucky enough to meet Paul Shechtman," and was grateful for "all his hard work."[74]  Sanders testified further that

> "[t]he [sentencing] agreement that is in front of you today is the course that I chose. I stand in front of you today accepting full responsibility for my crimes. . . .  Judge, in reaching an agreement with the government and beginning to meet my restitution obligations, *I tried to show you that I learned from my past.  I know I am heading back to jail and I deserve it.*  I hope when I come home, I will earn the respect of my wife, children and maybe even the Court.  God knows I will try."[75]

In sentencing Sanders to 121 months' imprisonment, the Court noted expressly that it had accepted the argument that the waiver of appellate and collateral attack rights demonstrated genuine remorse and acceptance of responsibility and relied upon that waiver in imposing a sentence below the stipulated guideline range.  The Court observed that:

> "[t]he individual I see here this morning is not the one I saw at this trial.  I saw a wiseguy who sat and smirked through the government's presentation in a case that was defensible, if at all, only on truly bizarre arguments. . . .  I doubt I would have said that had you not waived the ineffective assistance."[76]

The Court, speaking to Sanders, observed further that "[y]ou have been superbly represented by Mr. Shechtman.  Nobody could have done it better. . . .   It has helped you.  You are not going to be happy with the result anyway, but it has helped you.  I am telling you that."[77]

---

[74]  Sentencing Tr. at 13.

[75]  Sentencing Tr. at 13:14–17, 14:13–18 (emphasis added).

[76]  Sentencing Tr. at 15:19-24.

[77]  Sentencing Tr. at 16:11–15.

*Post-Sentencing Proceedings*

Sanders, proceeding *pro se*, moved on April 8, 2015 to vacate his sentence pursuant to 28 U.S.C. § 2255 on the ground that he had not received the effective assistance of counsel from either Shechtman or Hoffman.[78]   He then retained counsel, Todd Bussert, to file an amended petition, which is the operative document here.[79]   On October 27, 2015, Sanders filed papers which purported to "invok[e] his right to self-representation, for the sole purpose of filing" a motion to expand the evidentiary record.[80]   The Court denied this motion and denied Sanders' request to proceed partially *pro se*.[81]   Apparently unhappy with Bussert's representation, Sanders informed the Court that he wished to discharge Bussert.[82]   Sanders was temporarily unrepresented by counsel. The law firm Boies, Schiller & Flexner then entered the case on his behalf and tried the evidentiary hearing.[83]

On February 2 and 3, 2016, the Court held an evidentiary hearing on Sanders' IAC claims, hearing testimony from Hoffman, Shechtman, Sanders, Lankler, and Wolfe.

---

[78]   DI 125.

[79]   DI 143.

[80]   DI 155.

[81]   DI 158.

[82]   DI 161.

[83]   Minute Entry, November 24, 2015; DI 171 (Order dated December 4, 2015 approving new representation).

*Discussion*

## I.    The Applicable Standard

There are two fundamental obstacles to Sanders' quest for relief from the judgment of conviction.  First, the Court may not properly consider Sanders' collateral attack on the judgment unless Sanders' waiver in the SA of the right to make any such attack were avoided.  Even if Sanders could avoid the SA waiver, he then would have to prevail on the merits of the IAC claim with respect to Hoffman.  So the necessary starting point is with the claim that Sanders' waiver of the right to collaterally attack the judgment is unenforceable.

The waiver of the right to appeal a criminal judgment is enforceable if it is knowing and voluntary.[84]  As the Second Circuit has said, moreover, "[k]nowing and voluntary appellate waivers included in plea agreements must be enforced because, if they are not, 'the covenant not to appeal becomes meaningless and would cease to have value as a bargaining chip in the hands of defendants.'"[85]  The same is true of waiver of the right to collaterally attack the judgment or sentence in a criminal case.[86]  To be sure, such a waiver does not waive a challenge to the validity

---

[84]

    *E.g.*, *United States v. Monzon,* 359 F.3d 110, 116 (2d Cir. 2003).

[85]

    *United States v. Rosa*, 123 F.3d 94, 97–98 (2d Cir.1997) (quoting *United States v. Yemitan*, 70 F.3d 746, 748 (2d Cir.1995)); *see also United States v. Salcido–Contreras*, 990 F.2d 51, 53 (2d Cir.1993) ("In no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless.").

[86]

    *E.g.*, *Frederick v. Warden, Lewisburg Corr. Fac.,* 308 F.3d 192, 195 (2d Cir. 2002); *Garcia-Santos v. United States,* 273 F.3d 506, 508-09 (2d Cir. 2001); *Powell v. United States*, No. 05-cv-0163 (LAK), 2005 WL 2427888, at *1 (S.D.N.Y. Sept. 30, 2005); *see also United States v. Monzon*, 359 F.3d 110, 117 (2d Cir. 2004).

of the process by which it was obtained.[87]   Thus, the waiver in the Sentencing Agreement is fatal to Sanders' Section 2255 motion unless the process by which that waiver was obtained was constitutionally infirm.   Sanders claims that was the case by virtue of the alleged IAC by Shechtman.

To prevail on an IAC claim, the claimant must demonstrate both "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense."[88]   The attorney must be shown to have committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[89]   In assessing an attorney's conduct, the reviewing court must engage in a "highly deferential" review of that conduct and must indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[90]   Rather than "grade counsel's performance," it limits itself to determining "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process."[91]   The second *Strickland* prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[92]

---

[87]

*Frederick,* 308 F.3d at 195.

[88]

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord, e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

[89]

*Strickland*, 466 U.S. at 687.

[90]

*Id.* at 689.

[91]

*Id.* at 696; *see also United States v. Aguirre*, 912 F.2d 555, 561 (2d Cir.1990).

[92]

*Strickland*, 466 U.S. at 694; *accord, United States v. Tarricone*, 996 F.2d 1414, 1417 (2d Cir. 1993).

In light of these controlling standards, Sanders' waiver is enforceable unless he establishes that (1) Shechtman, in advising Sanders to enter into the Sentencing Agreement and thus to waive his IAC claim with respect to Hoffman, committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,"[93] and (2) "there is a reasonable probability that, but for [Shechtman's allegedly] unprofessional errors, the result of the proceeding would have been different"[94] – in other words, that (1) Sanders would not have waived his IAC claim with respect to Hoffman's performance and (2) there is a reasonable probability that that claim would have succeeded.[95]  If he fails on either branch of this analysis, his Section 2255 motion must be denied.

## II.   *Ineffective Assistance Claim Concerning Shechtman*

### A.   *The Advice to Waive Appellate Rights Was Not* Per Se *Ineffective Assistance.*

Sanders contends that it is *per se* ineffective assistance to advise a client to waive "what he knows to be a viable" IAC claim "in the plea proceedings."[96]  He makes three arguments in support of this contention.

---

[93]

*Strickland*, 466 U.S. at 687.

[94]

*Id.* at 694; *accord United States v. Tarricone*, 996 F.2d 1414, 1417 (2d Cir. 1993).

[95]

That of course would have entailed proceeding to sentencing without benefit of the Sentencing Agreement and judgment and making a § 2255 motion based on TC's alleged IAC.

[96]

DI 176 at 10.  The Court assumes Sanders meant to reference sentencing proceedings, the posture in which Shechtman rendered his allegedly ineffective assistance, rather than plea proceedings.

First, he argues, this Court should extend the logic of *Lafler v. Cooper*,[97] which held that counsel's ineffective assistance that leads to the rejection of a plea offer is not necessarily cured by the fact that the defendant receives a fair trial.  Sanders argues that "[i]t follows that this Sixth Amendment harm, when it is apparent to an attorney at sentencing, cannot be cured through a procedure where an attorney advises a defendant to waive what he knows to be a valid claim of ineffectiveness in the plea proceedings."[98]

Next, Sanders argues that there must be a *per se* rule because any less categorical position would create "a perverse incentive for attorneys" who ineffectively represented their clients at trial to include an IAC waiver in a sentencing agreement as a self-protection measure.[99]

Third, Sanders points to the Department of Justice's recent memorandum instructing federal prosecutors not to seek IAC waivers,[100] arguing that "it is implicit that the Department of Justice has identified that waivers involving ineffective assistance of counsel are different in kind from other waivers connected to the criminal prosecution process."[101]

Sanders' arguments fall short.  As an initial matter, Sanders' first argument, the argument based on *Lafler*, fails because it assumes there is no way to remedy ineffective representation other than through pursuing an IAC claim.  Yet *Lafler* does not prescribe a *per se* rule

---

[97]

132 S. Ct. 1376 (2012).

[98]

DI 176 at 11-12.

[99]

DI 176 at 12.

[100]

James M. Cole, Department Policy on Waivers of Claims of Ineffective Assistance of Counsel, https://www.justice.gov/file/70111/download (last visited June 30, 2016).

[101]

DI 176 at 13; PX 27.

– it holds simply that "the defendant who goes to trial instead of taking a more favorable plea *may be* prejudiced from either a conviction on more serious counts or the imposition of a more severe sentence."[102]   In other words, the Court held that a reviewing court must engage in the usual fact-specific examination of the claim instead of applying a *per se* rule that a fair trial cures any defective representation during plea bargaining.   This logic should apply equally in the context of an IAC waiver because is not difficult to imagine situations in which the best outcome for a defendant could be achieved through an IAC waiver.[103]   Moreover, a rule that turns on whether an IAC claim is "valid," as Sanders suggests it should, would require the reviewing court to engage in a fact-intensive investigation whether the IAC claim had merit, rendering his proposed *per se* rule a *per se* rule in name only.

Second, his position is directly inconsistent with the law of this Circuit, which is that "[t]here is no general bar to a waiver of collateral attack rights in a plea agreement."[104]   Courts have held time and again that "a waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured," which suggests that courts have considered the danger of which Sanders warns and found this protection sufficient.[105]   Sanders

---

102

      *Lafler*, 132 S. Ct. at 1386 (emphasis added).

103

      Indeed, the Court raised at oral argument the hypothetical of a defendant facing a death sentence who, by waiving an IAC claim, could receive a sentence of ten years imprisonment. Tr. 285:15–24.   The *per se* rule would render such a waiver invalid despite the fact that such an outcome would almost certainly be an extraordinarily favorable outcome for that defendant.

104

      *Frederick*, 308 F.3d at 195 (citing *Garcia-Santos*, 273 F.3d at 509).

105

      *Frederick*, 308 F.3d at 195; *United States v. Cleveland*, No. 14-4389-CR, 2016 WL 1055941, at *1 (2d Cir. Mar. 17, 2016) ("Typically, 'a waiver of appellate or collateral

cites no authority to the contrary.  Nor does he offer any cogent argument to explain why the usual fact-specific review in which courts engage on IAC claims affords inadequate protection.

Lastly, the Department of Justice memorandum does not, contrary to Sanders' implication, concede that IAC waivers are constitutionally more suspect than waivers of other appellate rights.  The memorandum does no more than instruct U.S. Attorney Offices not to seek the waiver of IAC claims when negotiating plea agreements.   But contrary to Sanders' characterization, the memorandum emphasizes that "the Department is confident that a waiver of a claim of ineffective assistance of counsel is both legal and ethical" and that the purpose of the Department's policy simply is to "bring consistency" to the practice of U.S. Attorneys offices nationwide.[106]  In any case, prospective administrative policies of the Department of Justice do not govern adjudication of alleged constitutional violations in previously decided cases.

> B.   *Shechtman's Representation Was Not Ineffective.*

We turn next to the merits of Sanders' claim of deficient performance by Shechtman. Its crux is the assertions that Shechtman (1) advised Sanders than any IAC waiver would be unenforceable, and (2) failed adequately to investigate and evaluate the merits of Sanders' IAC claim against Hoffman.[107]   The evidence, however, demonstrates – and the Court finds – that (1)

---

attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, [such as] the plea agreement,' including an ineffective assistance claim." (citing *Frederick*, 308 F.3d at 195)).

[106]

PX 27.

[107]

Sanders alleges also that Shechtman failed to advise him on the merits of various issues he claims could or should have been raised on direct appeal, including "(1) whether the mail fraud statute was properly used; (2) the degree of economic harm experienced by the victim

Sanders' claim that Shechtman advised him that an IAC claim would be unenforceable is a fabrication, and (2) Shechtman engaged in a careful investigation of both the facts and the law and made a reasoned and reasonable conclusion that the IAC claim would better serve Sanders' interests as a bargaining chip.  Accordingly, this claim fails.

     1. *Shechtman never advised Sanders that an IAC waiver would be unenforceable.*

   Sanders claims that Shechtman told him that Sanders would be able to bring an IAC claim against Hoffman despite the clear language of the SA because a waiver of such a claim would

---

insurance company; and (3) the question of whether the [insurance plans] would have agreed to these policies regardless of whether they received accurate information." Post-Hearing Brief, DI 176, at 14 & n.9.  The government contends that these issues were waived because Sanders failed to raise them in his amended petition, and raised them only in his rejected *pro se* motion to expand the record or in the post-hearing brief itself.  DI 183 at 14 n.7.  However, the more fundamental problem with these claims is that there is no persuasive evidence or basis to support them.

There is no duty for counsel to raise every nonfrivolous claim on appeal. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).  Rather, to show deficient performance by appellate counsel, "the district court must examine the trial court record to determine whether appellate counsel failed to present *significant and obvious* issues" that were "clearly stronger than those presented." *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985)).  In Sanders' situation, this would require some showing that Shechtman failed to investigate these claims adequately, that these claims were viable, and that Shechtman's strategy of waiving these claims was clearly inferior to pursuing an appeal.  He has not done so.  Moreover, as the government points out, there is a logical inconsistency to the argument that Shechtman failed to challenge the application of the mail fraud statute to Sanders, as this would be a claim of actual innocence, while simultaneously arguing that Hoffman's chief failure was in failing to advise Sanders to plead guilty.  DI 183 at 13-14 n.8.

be unenforceable.[108]  Indeed, at the evidentiary hearing, Sanders claimed that other attorneys gave him the same advice.[109]

This claim is nonsense.  Sanders has suggested no persuasive basis for supposing that any lawyer, let alone Paul Shechtman, could possibly have thought that the waiver in the SA would be unenforceable.  And he has suggested no persuasive basis for concluding that Shechtman told him that.  The Court finds that Sanders' testimony to that effect was false.  Indeed, it was a deliberate lie, as corroborated by emails that Sanders, through his wife, sent to Shechtman prior to sentencing. In one, he asked that Shechtman include in the sentencing submission a sentence stating that "Mr. Sanders has waved [sic] his rights for appeal and habeaus [sic] corpus to further demonstrate his acceptance of his guilt."[110]   In another, this to Lankler, Sanders expressed frustration with Shechtman's representation and the eight-to-ten-year guideline range that Shechtman had negotiated with the government.[111]  But critically, Sanders went on to write that "[t]hey want me to give up my habeaus [sic] corpus against Jeff, and any appeals.  I think this deal is nuts, but I can not fight with these people anymore."[112]  Together, these messages show that Sanders understood perfectly that

---

[108]

Tr. 194:6–13; DI 126 at 15.

[109]

Tr. 194-197.

[110]

GX 104.  Although the email was from Marcie Sanders' address, Shechtman understood this email to be "Scott, on this date, agreeing that this was the approach we would take.  It's his writing. . . .  And at the end of it, this was a good day in which he said he appreciated everything that I had done, although he recognized we had our disagreements."  Tr. 149:6–12.

[111]

GX 400.

[112]

GX 400.  In a similar vein, another email from either Marcie or Scott Sanders to Lankler expresses outrage that "we gave up all appeal rights, all my savings to the tune of 3.1 mil

he was waiving appellate and collateral attack rights in the SA.  Indeed, his displeasure with the deal shows that he knew full well that the IAC waiver would be enforceable.

In sum, based on the overwhelming weight of the evidence, the Court finds that Shechtman explained the SA, including the waiver of Sanders' right to file an IAC claim, and that Sanders understood exactly what rights he was giving up and the benefits he stood to gain by signing it.  Sanders' testimony that Shechtman and others told him the waivers would be unenforceable is patently false.

### 2.    *Shechtman made a full and careful investigation of the potential IAC claim.*

Counsel have a duty to investigate possible claims or defenses available to their clients, but need not exhaustively investigate every potentiality.[113]   Rather, the touchstone is reasonableness.[114]  Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[115]

---

[113]    and he still got 10 yrs."  GX 401.

*Strickland*, 466 U.S. at 690-91.

[114]    *Id.*

[115]    *Strickland*, 466 U.S. at 690-91; *see also Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015) ("'in assessing whether counsel exercised 'reasonable professional judgment,' [a court's] 'principal concern ... is not whether counsel should have presented' the additional evidence that further investigation would have revealed, but rather, 'whether the investigation supporting counsel's decision not to introduce' the additional evidence 'was itself reasonable.'" (quoting *Wiggins v. Smith*, 539 U.S. 510, 522-23, 527 (2003))).

Sanders argues that Shechtman's analysis of Sanders' potential IAC claim as to Hoffman was constitutionally deficient, both in terms of Shechtman's investigation and his analysis of what that investigation uncovered.  The evidence, however, disproves this contention.

First, the evidence shows that Shechtman interviewed the key witnesses and had more than enough information to evaluate reasonably the potential IAC claim.  He had numerous conversations with Sanders himself, at least two with Hoffman, one with Wolfe, and one with Lankler.  He knew that Sanders claimed that Hoffman failed to advise him to take a plea agreement in March of 2012, which, in Shechtman's (mistaken) understanding, would have had a guideline range of 33 to 41 months and a five-year maximum.  Shechtman knew also that Lankler would testify that Hoffman advised Sanders at that meeting that Sanders would get a more favorable sentence after trial than the plea possibilities that had been discussed by that time.  In addition, Shechtman was aware of the rejected October 2012 plea offer.  And, as he made clear at the sentencing hearing, Shechtman certainly did not have a favorable view of Hoffman's representation.  Nevertheless, he advised Sanders that the IAC claim with respect to Hoffman was not strong and was worth more as a bargaining chip with respect to the sentence.

Next, Shechtman's analysis of the information he gathered was eminently reasonable.  Sanders argues in particular that Shechtman's evaluation that the IAC claim would turn on a "credibility contest" between Hoffman and Sanders inappropriately ignored Lanker's likely testimony and was "tantamount to an attorney advising a client accused of murder that this was a single witness case" despite knowing of a credible exculpatory witness.[116]

---

[116] DI 176 at 15.

Sanders' colorful analogy flies in the face of the evidence.  Shechtman carefully considered whether Lankler's testimony would help or hurt Sanders.  In particular, Shechtman considered that Lankler's testimony would relate to the March 2012 meeting, which predated the unsealing of the indictment by five months and related at best to a verbal plea offer.  Shechtman believed also that Sanders' failure to follow Lankler's advice to consult another attorney would hurt Sanders' claim by corroborating Hoffman's testimony that Sanders was unwilling to consider plea offers.  Accordingly, far from disregarding or undervaluing Lankler's testimony, Shechtman in fact engaged in a nuanced analysis of that testimony and concluded that there was a real chance it could hurt Sanders.  Indeed, Lankler himself reached the same view as Shechtman concerning the likely outcome of the IAC claim as to Hoffman.[117]  Moreover, as discussed previously, Shechtman had serious concerns about whether Sanders would make a credible witness and how his testimony would be received.

In all the circumstances, there is no evidence whatsoever that Shechtman's performance was anything less than exemplary.  It was not constitutionally deficient.  Sanders therefore has failed to meet the first prong of *Strickland* as to Shechtman.

C.   *Sanders Was Not Prejudiced Even if Shechtman's Representation Was Ineffective.*

Even if Shechtman's advice to sign the SA had been constitutionally deficient, Sanders' IAC claim with regard to Shechtman could not succeed because he did not show any

---

[117]   Tr. 83:17–20.  Lankler was not, of course, retained by Sanders to analyze the merits of an IAC claim against Hoffman.  However, the fact that he agreed with Shechtman's analysis – and told Shechtman so – certainly is evidence of the reasonableness of Shechtman's strategic approach.

prejudice.  Sanders' post-hearing brief in essence argues that the waiver of collateral attack rights was *per se* prejudicial, contending that "the answer to the basic question of prejudice is obvious – as a result of the improper advice, Mr. Sanders lost the opportunity to pursue a valid claim of [IAC] against Mr. Hoffman."[118]   As a result, he argues, he would have received a lesser sentence.[119]  However, as the government points out, this conclusory assertion glosses over an important step.

   *Strickland* requires Sanders to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[120]  Here, that requires Sanders to show not only that Shechtman's allegedly ineffective assistance caused Sanders to waive his IAC claim concerning Hoffman, but also that there is a reasonable probability that that claim would have succeeded and, in addition, that the end result for Sanders of the prosecution against him would have been more favorable to him.[121]  Accordingly, a determination of whether Sanders was

---

118  DI 176 at 18.

119  *Id.*

120  *Strickland*, 466 U.S. at 694.

121  In an analogous situation, the Supreme Court held that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).  Thus here, where Sanders' IAC claim against Shechtman rests on the failure to pursue an claim against Hoffman, prejudice is not established merely by that failure.  Rather, prejudice can be shown only if there is a reasonable probability that the claim against Hoffman would have succeeded and affected the ultimate disposition.

37

prejudiced by any deficient counsel by Shechtman turns first on the merits of Sanders' claim against Hoffman.[122]

   1. *Hoffman's representation was not constitutionally deficient.*

   Sanders' amended petition argues that Hoffman's representation was deficient because he inaccurately assessed the strength of Sanders' case and therefore advised Sanders to proceed to trial rather than taking a favorable plea deal.

   In analyzing counsel's performance in the context of plea negotiations, an attorney must advise his or her client as to the terms of a plea offer "and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed."[123]  Otherwise, it would not be possible for the defendant to make an informed choice about whether to accept a plea.  But the law recognizes also that "the ultimate decision whether to plead guilty must be made by the defendant[,] . . . [and] a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer."[124]

   Hoffman's advice that Sanders would get a better result after trial than if he pursued the government's indication that it might take a plea with a sentence in the eight to ten year range

---

[122]  The Court notes the distinction between the analysis under this prejudice prong of Hoffman's performance as compared with the previous section examining whether Shechtman's analysis of the IAC claim against Hoffman was deficient.  In examining Shechtman's performance, the Court considered only the information Shechtman had at the time of his representation, whereas the Court properly considers the full record for the present purpose.

[123]  *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000).

[124]  *Id.*

is certainly troubling.  But the timing of that advice is significant.  The conversation Lankler and Sanders testified to was in March 2012, at which point there was no plea offer on the table and what had occurred was an "amorphous" discussion of possibilities.[125]  That being the case, it is arguable that advising Sanders to accept that offer would have been bad advice given the fact that Hoffman believed at the time – rightly, it turns out – that he could improve significantly upon the offer through continued negotiations.  Thus, this advice does not rise to the level of deficiency required by *Strickland*.[126]

Moreover, whatever advice Hoffman gave in March 2012 is not necessarily probative of the advice he gave in relation to the October 2012 offer.  And there is no evidence before the Court (save Sanders' discredited testimony) that Hoffman advised Sanders to reject the October 2012 plea offer.  Indeed, the Court finds that both Hoffman and Wolfe advised him to accept, but Sanders rejected the offer.[127]  At most, therefore, Hoffman's alleged failing in this respect is that he did not push Sanders as hard as another attorney might have to accept the offer.  But that contention is far from sufficient to prove that Hoffman's representation was constitutionally deficient.[128]

---

[125]

       The Court has already discussed why it does not credit Sanders' testimony to the contrary and why Shechtman's understanding of the offer at that time was based on a mistaken conflation of the details with the later October 2012 offer.

[126]

       *See United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." (quotations omitted)).

[127]

       *See* Tr. 13:19–14:5 (Hoffman testifying that he "was very much in favor of taking" the offer and "explained [to Sanders] why that was an excellent plea offer"); Tr. 247:24–248:7 (Wolfe testifying she was so surprised when Hoffman told her Sanders rejected the offer that she called him herself).

[128]

       *Purdy*, 208 F.3d at 45 ("Counsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a

Here, the evidence demonstrates that Hoffman sought and received a favorable plea offer for Sanders.  As the Court noted following trial, the government's evidence against Sanders was quite strong on mail fraud charges that carried a possible 20 year prison sentence.  Yet despite that, Hoffman secured a plea offer on Sanders' behalf that not only had a low guideline range of 33 to 41 months, but also a statutory five-year maximum penalty.  While it may have been desirable for Hoffman to have pushed Sanders harder to accept that offer, there is no persuasive evidence that Hoffman inaccurately conveyed the terms of the offer or that he offered unfounded estimates about the strength of the government's case or Sanders' defenses.  Sanders elected to roll the dice at trial in hopes of an acquittal.  That he gambled and lost is not the fault of his counsel.[129]

### 2. *Sanders was not prejudiced even if Hoffman's representation was deficient.*

Lastly, even if Hoffman's representation were deficient, Sanders has not shown prejudice because he has not met his burden of proving that he would have accepted the plea deal had he received different advice.

"[I]n order to establish *Strickland* prejudice [in the plea context], a defendant must show that but for the ineffective assistance of counsel there is a reasonable probability that the

---

wide range of reasonableness because '[r]epresentation is an art,' and '[t]here are countless ways to provide effective assistance in any given case.'" (quoting *Strickland*, 466 U.S. at 693, 689)).

[129]

The Court notes also that Sanders filed a complaint against Hoffman with the Departmental Disciplinary Committee of the New York Supreme Court, Appellate Division, First Judicial Department.  The committee concluded that no disciplinary action against Hoffman was warranted.  GX 201.  This is not conclusive that Hoffman committed no wrongdoing, of course, but does tend to confirm the conclusion that Hoffman's representation was not constitutionally deficient.

defendant would have accepted the plea."[130]   "In the context of plea negotiations, a defendant can make this showing by producing both a sworn affidavit or testimony stating that he would have accepted or rejected a plea agreement but for his counsel's deficient performance and also some additional 'objective evidence' supporting his claim."[131]  This "objective evidence" may be "a large disparity between the defendant's advised and actual sentencing exposure."[132]  But even where there is such a disparity,"the district court must still find the defendant's evidence to the effect that he would have made a different decision but for his counsel's deficient advice to be credible."[133]

As an initial matter, Sanders could not have been prejudiced by Hoffman's advice in March 2012 that he would receive a better outcome even if convicted at trial because there is no evidence that Sanders would have accepted a plea offer in the eight-to-ten-year range, even assuming the government's amorphous discussion of possibilities would have resulted in an offer capable of acceptance if Sanders had pressed the matter.  More broadly, Sander was wholly unwilling to accept any plea offer that would have resulted in a sentence in excess of a year and a day.  That this was his position was corroborated by every witness other than Sanders, including

---

[130]

United States v. Marks, 561 F. App'x 42, 45 (2d Cir.), cert. denied, 135 S. Ct. 301, 190 L. Ed. 2d 236 (2014) (citing Missouri v. Frye,132 S.Ct. 1399, 1409 (2012); Lafler v. Cooper, 132 S.Ct. 1376, 1385 (2012)).

[131]

United States v. Frederick, 526 F. App'x 91, 93 (2d Cir. 2013).

[132]

Id.

[133]

Id. (citing Purdy v. United States, 208 F.3d 41, 49 (2d Cir. 2000); see also United States v. Arteca, 411 F.3d 315, 321 (2d Cir. 2005) ("This court has not adopted mechanistic rules for determining whether an adequate showing of prejudice has been made, but inquires into the record as a whole to determine whether a reasonable probability exists that absent counsel's error, the outcome of the proceeding would have been different.").

Lankler, upon whom Sanders pins much of his case.  Lankler's impression after the March 2012 meeting was that Sanders was "arrogant" in his belief that the case should be resolved civilly.  And there is no evidence such a deal ever was available to him.

Sanders argues that this position was influenced by Hoffman's erroneous advice about the strength of his case.[134]  But this assertion is supported principally by unpersuasive testimony and belied by several pieces of evidence.  First, Sanders knew that Lankler was concerned about the advice Hoffman was providing, yet never sought advice from another attorney.  Second, in October 2012, Wolfe was so surprised when Hoffman told her that Sanders had rejected the plea offer that she insisted on calling him herself.  She ended that call convinced that Sanders would take no plea in excess of a year and a day.  And perhaps most damning is the September 27, 2013 email Sanders sent Shechtman.  Sanders wrote this message after having been convicted by a jury that deliberated for less than two hours and having been told by the Court that the government's evidence had been overwhelming.  Yet despite that, Sanders clung to his position that "[e]veryone made money and now they want to send me to jail for 12 years.  This is really unfair!!!"

This Court finds in all the circumstances that there is no reasonable probability that Sanders, but for allegedly constitutionally deficient advice from Hoffman, would have accepted any plea that ever was offered.  Accordingly, Sanders has not proved that he was prejudiced even if Hoffman's representation had been constitutionally defective.  And because Sanders has failed to prove a reasonable probability that his claim concerning Hoffman would have succeeded, he has failed also to prove that any deficiencies in Shechtman's representation prejudiced him.

---

[134]  *E.g.*, DI 176 at 20.

*Conclusion*

Sanders' claims fail on every level.  The evidence demonstrates that Sanders was ably and effectively represented by Paul Shechtman, whose performance and strategic choices contributed to a reduced sentencing guideline range and, in addition, to the Court's giving Sanders a below-guidelines sentence.  But even if Shechtman's representation of Sanders had been ineffective, the evidence was insufficient to establish any prejudice because Sanders showed neither that Hoffman's representation fell below the constitutional minimum nor that, but for any alleged deficiencies in Hoffman's advice, Sanders would have accepted any plea ever offered to him.  At bottom, Sanders gambled that he could win an acquittal at trial and lost the bet.  He now seeks to avoid the choices he made that put him in his current position.  Unfortunately for him, these are not choices the law permits him to take back.

Accordingly, Sanders' motion to vacate his sentence pursuant to 28 U.S.C. § 2255, DI 143, is denied.  A certificate of appealability is denied, and the Court determines that any appeal herefrom would not be taken in good faith within the meaning of 28 U.S.C. § 1915(d).

SO ORDERED.

Dated:        June 30, 2016
Corrected:   July 5, 2016

/s/ Lewis A Kaplan

_____

Lewis A. Kaplan
United States District Judge